FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JORDAN MARKS, individually and on behalf of all others similarly situated, *Plaintiff-Appellant*, <br><br> v. <br><br> CRUNCH SAN DIEGO, LLC, *Defendant-Appellee.* | No. 14-56834 <br><br> D.C. No. 3:14-cv-00348-BAS-BLM <br><br><br> OPINION |

Appeal from the United States District Court
for the Southern District of California
Cynthia A. Bashant, District Judge, Presiding

Argued and Submitted December 6, 2016
Submission Vacated December 14, 2016
Resubmitted September 13, 2018
Pasadena, California

Filed September 20, 2018

Before: Consuelo M. Callahan, Carlos T. Bea,
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta

## SUMMARY[*]

**Telephone Consumer Protection Act**

The panel vacated the district court's grant of summary judgment to the defendant on a claim under the Telephone Consumer Protection Act, which places restrictions on the use of automated telephone equipment.

The plaintiff alleged that three text messages that he received from the defendant violated the TCPA. The district court held that the automatic text messaging system that had sent the messages was not an automatic telephone dialing system ("ATDS") under the TCPA because it lacked the present or potential capacity "to store or produce telephone numbers to be called, using a random or sequential number generator." After the district court ruled, the D.C. Circuit issued its opinion in *ACA Int'l v. Fed. Comm'cns Comm'n*, 885 F.3d 687 (D.C. Cir. 2018), invalidating the FCC's interpretation of questions raised by the statutory definition of an ATDS.

The panel held that, in light of *ACA Int'l*, and based on its own review of the TCPA, the statutory definition of an ATDS includes a device that stores telephone numbers to be called, whether or not those numbers have been generated by a random or sequential number generator. The panel remanded the case for further proceedings.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Seyed Abbas Kazerounian (argued) and Jason A. Ibey, Kazerouni Law Group APC, Costa Mesa, California; Joshua B. Swigart, Hyde & Swigart, San Diego, California; for Plaintiff-Appellant.

Ian C. Ballan (argued), Lori Chang, Nina D. Boyajian, and Justin A. Barton, Greenberg Traurig LLP, Los Angeles, California, for Defendant-Appellee.

Shay Dvoretzky, Jeffrey R. Johnson, and Vivek Suri, Jones Day, Washington, D.C., for Amicus Curiae Sirius XM Radio Inc.

Brian Melendez, Barnes & Thornburg LLP, Minneapolis, Minnesota, for Amicus Curiae ACA International.

Stuart T. Rossman and Carolyn Carter, National Consumer Law Center, Boston, Massachusetts; Ira Rheingold, National Association of Consumer Advocates, Washington, D.C.; for Amici Curiae National Consumer Law Center and National Association of Consumer Advocates.

**OPINION**

IKUTA, Circuit Judge:

Jordan Marks appeals the grant of summary judgment to Crunch Fitness on his claim that three text messages he received from Crunch violated the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227. The district court held that the automatic text messaging system that had sent the messages was not an automatic telephone dialing system (ATDS) under the TCPA, because it lacked the present or potential capacity "to store or produce telephone numbers to be called, using a random or sequential number generator." *Id.* § 227(a)(1). In light of the D.C. Circuit's recent opinion in *ACA International v. Federal Communications Commission*, 885 F.3d 687 (D.C. Cir. 2018) (which was decided after the district court ruled), and based on our own review of the TCPA, we conclude that the statutory definition of ATDS includes a device that stores telephone numbers to be called, whether or not those numbers have been generated by a random or sequential number generator. Therefore, we reverse the district court's grant of summary judgment.

I

A

By the early 1990s, telemarketing was in its golden age. Telemarketing sales had "skyrocketed to over $435 million in 1990," which was a "fourfold increase since 1984." 137 Cong. Rec. S16,971 (daily ed. June 27, 1991) (statement of Rep. Pressler). "This marketing success ha[d] created an industry in which over 300,000 telemarketing solicitors call[ed] more than 18 million Americans every day." *Id.* In

part, this was due to the advent of machines that "automatically dial a telephone number and deliver to the called party an artificial or prerecorded voice message." S. Rep. No. 102-178, at 2 (1991). Advertisers found these autodialers highly efficient because they could "ensure that a company's message gets to potential customers in the exact same way, every time, without incurring the normal cost of human intervention." H.R. Rep. No. 102-317, at 6 (1991). At that time, a single autodialer could cause as many as 1,000 phones to ring and then deliver a prerecorded message to each. *Id.* at 10.

The dark side of this success story caught Congress's attention. As Senator Fritz Hollings complained, "[c]omputerized calls are the scourge of modern civilization. They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone right out of the wall." 137 Cong. Rec. S16,205 (daily ed. Nov. 7, 1991) (statement of Sen. Hollings). Recipients deemed that "automated telephone calls that deliver an artificial or prerecorded voice message are more of a nuisance and a greater invasion of privacy than calls placed by 'live' persons." S. Rep. No. 102-178, at 4. Among other reasons, "[t]hese automated calls cannot interact with the customer except in preprogrammed ways, do not allow the caller to feel the frustration of the called party" and deprive customers of "the ability to slam the telephone down on a live human being." *Id.* at 4 & n.3 (citation omitted). Congress also noted surveys wherein consumers responded that the two most annoying things were (1) "[p]hone calls from people selling things" and (2) "phone calls from a computer trying to sell something." H.R. Rep. No. 102-317, at 9.

The volume of automated telemarketing calls was not only an annoyance but also posed dangers to public safety. S. Rep. No. 102-177, at 20 (1991). "Due to advances in autodialer technology," the machines could be programmed to call numbers in large sequential blocks or dial random 10-digit strings of numbers. *Id*. This resulted in calls hitting hospitals and emergency care providers "and sequentially delivering a recorded message to all telephone lines." *Id*. And because some autodialers would "not release [the line] until the prerecorded message is played, even when the called party hangs up," H.R. Rep. No. 102-317, at 10, there was a danger that the autodialers could "seize" emergency or medical assistance telephone lines, rendering them inoperable, and "dangerously preventing those lines from being utilized to receive calls from those needing emergency services," H.R. Rep. No. 101-633, at 3 (1990). Representative Marge Roukema noted that it was "not just calls to doctors' offices or police and fire stations that pose a public health hazard." 137 Cong. Rec. H35,305 (daily ed. Nov. 26, 1991) (statement of Rep. Roukema). She recounted "the sheer terror" of a New York mother who, when she tried to call an ambulance for her injured child, "picked up her phone only to find it occupied by a computer call that would not disconnect." *Id.* at 35,305–06.

In light of these and other concerns, Senator Hollings introduced a bill to amend the Communications Act of 1934, in order to "protect the privacy interests of residential telephone subscribers by placing restrictions on unsolicited, automated telephone calls to the home and to facilitate interstate commerce by restricting certain uses of facsimile (fax) machines and automatic dialers." S. Rep. No. 102-178, at 1. This bill became the Telephone Consumer Protection Act of 1991.

As originally enacted, the TCPA placed restrictions on the use of automated telephone equipment, including automatic telephone dialing systems and telephone facsimile machines. The statute defined "automatic telephone dialing systems" (ATDS) as follows:

> (1) The term 'automatic telephone dialing system' means equipment which has the capacity—
>
> (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and
>
> (B) to dial such numbers.

Pub. L. No. 102-243, § 227, 105 Stat. 2394, 2395. This language established Congress's intent to regulate equipment that is "automatic," and that has "the capacity" to function in two specified ways: "to store or produce telephone numbers to be called, using a random or sequential number generator" and "to dial" those telephone numbers. Although the TCPA has been amended several times since its original enactment, Congress has never revised the definition of an ATDS. Therefore, Congress's decision to regulate only those devices which have the aforementioned functions, capacity, and ability to function automatically remains unchanged.

The TCPA prohibited the use of an ATDS to make "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice" to emergency telephone lines, hospital rooms or other health care facilities, and paging and cellular

telephones.    47 U.S.C. § 227(b)(1)(A) (1991).    It also
prohibited the use of an ATDS "in such a way that two or
more telephone lines of a multi-line business are engaged
simultaneously." *Id.* § 227(b)(1)(D).

As required by the TCPA, *id.* § 227(b)(2), in 1992 the
FCC promulgated rules to implement the statute. *See Rules
& Regulations Implementing the Tel. Consumer Prot. Act of
1991*, 7 FCC Rcd. 8752, 8753 (1992).  The FCC did not
elaborate on the functions of an ATDS and its definition
merely tracked the statutory definition.   *Id.* at 8755 n.6,
8792.[1]

B

It was not until ten years later that the FCC realized that
"the telemarketing industry ha[d] undergone significant
changes in the technologies and methods used to contact
consumers," and such marketplace changes warranted
modifications to the existing rules.  *Rules & Regulations
Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC
Rcd. 14,014, 14,017 (2003) (*2003 Order*).  In particular, the

---

[1] As originally promulgated, 47 C.F.R. § 64.1200(f)(1) (1992)
provided:

> (f) As used in this section:

> (1) The terms automatic telephone dialing system and
> autodialer mean equipment which has the capacity to
> store or produce telephone numbers to be called using
> a random or sequential number generator and to dial
> such numbers.

The same definition is in force today.

FCC was concerned about the proliferating use of the predictive dialer, which is "an automated dialing system that uses a complex set of algorithms to automatically dial consumers' telephone numbers in a manner that 'predicts' the time when a consumer will answer the phone and a telemarketer will be available to take the call." *Id.* at 14,022 n.31. Unlike the automated telemarketing devices prevalent in the early 1990s, which dialed a random or sequential block of numbers, predictive dialers generally automatically dialed a list of numbers that had been preprogrammed and stored in the dialer, or were downloaded from a computer database. *Id.* at 14,090.

In order to determine whether the TCPA applied to this new technology, the FCC had to assess whether the predictive dialer qualified as an ATDS. This required consideration of the statutory definition: whether the equipment was "automatic" and whether it had the capacity to function in the two relevant ways.

In a series of rulings, from 2003 to 2015, the FCC determined that predictive dialers and other new technology qualified as an ATDS, even if they did not generally generate or store random or sequential numbers. In its 2003 ruling, the FCC reasoned that a predictive dialer may have the "capacity" to dial random and sequential numbers, even if it was not currently being used for such a purpose. *Id.* at 14,091. The FCC acknowledged the telemarketing industry's argument that predictive dialers do not fall within the statutory definition of ATDS because they "do not dial numbers 'randomly or sequentially,'" but nevertheless concluded that predictive dialers' "hardware, when paired with certain software, ha[d] the capacity to store or produce numbers and dial those numbers at random, in sequential

order, or from a database of numbers." *Id.* at 14,090–91. In its later 2015 order, the FCC went even further, and determined that a device could have the requisite capacity if it had any potential to be configured for that purpose. *Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd. 7961, 7974 (2015) (*2015 Declaratory Ruling*) (holding that "the capacity of an autodialer is not limited to its current configuration but also includes its potential functionalities").

Second, the FCC suggested that a device could qualify as an ATDS even if it entirely lacked the capacity to dial numbers randomly or sequentially. Thus in its 2012 ruling, the FCC stated that the definition of an ATDS "covers any equipment that has the specified *capacity* to generate numbers and dial them without human intervention regardless of whether the numbers called are randomly or sequentially generated or come from calling lists." *Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 15,391, 15,392 n.5 (2012) (*2012 Declaratory Ruling*). The FCC's subsequent 2015 ruling, however, made the contrary suggestion that a device would not meet the definition of an ATDS unless it had the capacity to dial random or sequential numbers. *See 2015 Declaratory Ruling*, 30 FCC Rcd. at 7971–72 ("We reaffirm our previous statements that dialing equipment generally has the capacity to store or produce, and dial random or sequential numbers (and thus meets the TCPA's definition of 'autodialer') even if it is not presently used for that purpose, including when the caller is calling a set list of consumers.").

The FCC relied on policy and legislative history to support its application of the definition of ATDS to new technology. The FCC reasoned that "through the TCPA,

Congress was attempting to alleviate a particular problem—an increasing number of automated and prerecorded calls to certain categories of numbers," and therefore Congress intended for any device that had the basic function of being automatic, i.e., had "the *capacity* to dial numbers without human intervention," *2003 Order*, 18 FCC Rcd. at 14,092, to be regulated under the TCPA.**[2]** Further, the FCC thought that it was clear "that Congress anticipated that the FCC, under its TCPA rulemaking authority, might need to consider changes in technologies." *Id.* Accordingly, the FCC concluded that an interpretation of the statutory definition of ATDS which excluded new technology that could automatically dial thousands of numbers merely because it "relies on a given set of numbers would lead to an unintended result" and fail to effectuate the purpose of the statutory requirement. *Id.*

C

After the FCC's 2015 ruling, a large number of regulated entities challenged the FCC's definition of an ATDS in the D.C. and Seventh Circuits, and the petitions were consolidated in the D.C. Circuit. *See* Consolidation Order, *ACA Int'l v. FCC*, 885 F.3d 687 (D.C. Cir. 2018) (No. 15-1211). Among other things, petitioners had sought clarification from the FCC on how the TCPA applied to new technologies, including cloud-based dialing options and

---

**[2]** In the 2003 order, the FCC also confirmed that the TCPA applied to both voice calls and "text calls to wireless numbers" including short message service (SMS) calls, which "provide[] the ability for users to send and receive text messages to and from mobile handsets with maximum message length ranging from 120 to 500 characters." *2003 Order*, 18 FCC Rcd. at 14,115 & n.606 (citation omitted).

smartphone apps. *2015 Declaratory Ruling*, 30 FCC Rcd. at 7970. In challenging the 2015 order, petitioners argued that they had not received the clarification they sought, asserting specifically that the FCC erred in concluding that equipment that merely had the potential future capacity to function as an autodialer, taking into account possible upgrades or modifications, met the statutory definition of ATDS. *ACA Int'l*, 885 F.3d at 696. They also challenged the FCC's conclusion that equipment qualifies as an ATDS so long as it can automatically dial from a list of numbers, even if it does not have the capacity to store or produce random or sequential numbers. *Id.* at 694.

The D.C. Circuit first asked whether it had jurisdiction to consider all of the FCC's rulings on this issue, including those that predated the 2015 order. Although normally all challenges to an FCC rule must be made within 60 days after its entry, 28 U.S.C. § 2344, a petition for a rulemaking may reopen consideration of prior rulemakings, *see Pub. Citizen v. Nuclear Regulatory Comm'n*, 901 F.2d 147, 151–52 (D.C. Cir. 1990). "An agency's reconsideration of a rule in a new rulemaking constitutes a reopening when the original rule is 'reinstated' so as to have renewed effect." *Biggerstaff v. FCC*, 511 F.3d 178, 185 (D.C. Cir. 2007) (quoting *Pub. Citizen*, 901 F.2d at 152). The D.C. Circuit concluded that the parties' 2015 rulemaking petition to the FCC reopened consideration of the definition of ATDS established in the FCC's 2003 order, as well as its subsequent rulings. *ACA Int'l*, 885 F.3d at 701.

On the merits, the D.C. Circuit invalidated the FCC's interpretation of the two key questions raised by the statutory definition of an ATDS, namely: "(i) when does a device have

the 'capacity' to perform the two enumerated functions; and (ii) what precisely are those functions?" *Id.* at 695.

Turning first to the FCC's interpretation of "capacity," the D.C. Circuit concluded it was overbroad. According to the court, the "straightforward understanding of the Commission's ruling is that all smartphones qualify as autodialers because they have the inherent 'capacity' to gain ATDS functionality by downloading an app." *Id.* at 700. Because "[i]t cannot be the case that every uninvited communication from a smartphone infringes federal law, and that nearly every American is a TCPA-violator-in-waiting, if not a violator-in-fact," *id.* at 698, the D.C. Circuit concluded that the FCC's interpretation "is an unreasonably, and impermissibly, expansive one," *id.* at 700.

Turning to the second issue, the D.C. Circuit concluded that the FCC's explanation of the functions of an ATDS was inadequate. The court explained that "[a] basic question raised by the statutory definition is whether a device must *itself* have the ability to generate random or sequential telephone numbers to be dialed," or whether it would be "enough if the device can call from a database of telephone numbers generated elsewhere." *Id.* at 701. The FCC had stated that a device qualified as an ATDS *only if* it could generate random or sequential numbers to be dialed, but also indicated that a device which could only dial numbers from a stored list also qualified as an ATDS. *Id.* at 701–02. While "[i]t might be permissible for the Commission to adopt either interpretation," the D.C. Circuit held that "the Commission cannot, consistent with reasoned decisionmaking, espouse both competing interpretations in the same order." *Id.* at 703. The D.C. Circuit also noted that the 2015 ruling lacked clarity on whether an autodialer must dial numbers without human

intervention. Although the FCC indicated that "the 'basic function[]' of an autodialer is to 'dial numbers without human intervention,'" it declined a request to clarify that a dialer must have such a feature. *Id.* (alteration in original) (quoting *2015 Declaratory Ruling*, 30 FCC Rcd. at 7975). Because "[t]he order's lack of clarity about which functions qualify a device as an autodialer compounds the unreasonableness of the Commission's expansive understanding of when a device has the 'capacity' to perform the necessary functions," the court "set aside the Commission's treatment of those matters." *Id.*

## II

We now turn to the facts of this case. The device at issue in this appeal is called the Textmunication system, which is a web-based marketing platform designed to send promotional text messages to a list of stored telephone numbers.[3] Phone numbers are captured and stored in one of three ways: An operator of the Textmunication system may manually enter a phone number into the system; a current or potential customer may respond to a marketing campaign with a text (which automatically provides the customer's phone number); or a customer may provide a phone number by filling out a consent form on a Textmunication client's website. A client of Textmunication can then design a marketing campaign that, for example, offers customers free passes and personal training sessions, provides appointment reminders and class updates, or sends birthday greetings, and

---

[3] We have concluded that the TCPA applies to text messages because it is "a form of communication used primarily between telephones." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 953–54 (9th Cir. 2009).

the Textmunication system will automatically send the desired messages to the stored phone numbers at a time scheduled by the client.

Crunch Fitness communicates with its prospective and current gym members by sending text messages through this Textmunication system. When Crunch wants to send a text message to its current or prospective customers, a Crunch employee logs into the Textmunication system, selects the recipient phone numbers, generates the content of the message, and selects the date and time for the message to be sent. The Textmunication system will then automatically send the text messages to the selected phone numbers at the appointed time.

Jordan Marks signed up for a gym membership with Crunch Fitness in 2012. After joining the gym, Marks received three text messages from Crunch over a period of eleven months. Marks's phone carrier charged him incoming tolls for each of these text messages. In February 2014, Marks filed a putative class action complaint against Crunch, alleging violations of § 227(b) of the TCPA. He claimed that Crunch "negligently contact[ed] [him] on [his] cellular telephone, in violation of the [TCPA], thereby invading [his] privacy." Marks alleged that the text messages were sent using an ATDS which has "the capacity to send text messages to cellular telephone numbers from a list of telephone numbers automatically and without human intervention."

The district court granted summary judgment in favor of Crunch on the ground that the Textmunication system did not qualify as an ATDS because it presently lacked a random or sequential number generator, and did not have the potential capacity to add such a feature. Because it defined an ATDS

as necessarily including a random or sequential number generator, the court did not consider the declaration of Marks's expert witness, Jeffrey Hansen, stating that the Textmunication system called numbers from a stored list. The court therefore denied Crunch's motion to exclude Hansen's testimony as moot. Marks timely appealed. We vacated submission of Marks's appeal pending the issuance of *ACA International*.

III

A

After *ACA International* was issued, we ordered supplemental briefing to address the impact of the D.C. Circuit's opinion on this case. Under the Hobbs Act, an appellate court "has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of—(1) all final orders of the [FCC] made reviewable by [47 U.S.C § 402(a)]," 28 U.S.C. § 2342, so long as the appeal is timely, meaning that it was brought within sixty days from when the FCC releases the final order to the public, *see* 28 U.S.C. § 2344.[4] Here, various parties timely challenged the FCC's 2015 order in both the Seventh and D.C. Circuits; these challenges were consolidated and assigned to the D.C. Circuit, which then became "the sole forum for addressing . . . the validity of the FCC's" order. *MCI Telecomms. Corp.*

---

[4] An appellate court lacks authority to consider a challenge to an FCC order that is brought after sixty days from the date when the FCC releases the final order to the public. *See* 28 U.S.C. § 2344; *see also U.S. W. Commc'ns, Inc. v. Jennings*, 304 F.3d 950, 958 n.2 (9th Cir. 2002) (stating that "[p]roperly promulgated FCC regulations currently in effect must be presumed valid" for purposes of a case not brought pursuant to a petition under the Hobbs Act).

*v. U.S. W. Commc'ns*, 204 F.3d 1262, 1267 (9th Cir. 2000) (quoting *GTE South, Inc. v. Morrison*, 199 F.3d 733, 743 (4th Cir. 1999)).  Because the D.C. Circuit exercised its authority to set aside the FCC's interpretations of the definition of an ATDS in the 2015 order, 28 U.S.C. § 2342, and any prior FCC rules that were reinstated by the 2015 order, *see Biggerstaff*, 511 F.3d at 185 (quoting *Pub. Citizen*, 901 F.2d at 152), we conclude that the FCC's prior orders on that issue are no longer binding on us.  *See King v. Time Warner Cable Inc.*, 849 F.3d 473, 476–77 (2d Cir. 2018) (holding that *ACA International* "invalidated that [FCC 2015 Declaratory Ruling] and thereby removed any deference we might owe to the views the FCC expressed in it"); *Dominguez ex rel Himself v. Yahoo, Inc.*, 894 F.3d 116, 119 (3d Cir. 2018) (holding that in light of the D.C. Circuit's holding, the court was free to interpret the statutory definition of an autodialer as it had prior to the issuance of the FCC's 2015 order).

We review a district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party in order to determine whether there are any genuine issues of material fact.  *Thomas v. Ponder*, 611 F.3d 1144, 1149–50 (9th Cir. 2010).  The district court had jurisdiction under 28 U.S.C. § 1331.  We have jurisdiction under 28 U.S.C. § 1291.

B

Because the D.C. Circuit vacated the FCC's interpretation of what sort of device qualified as an ATDS, only the statutory definition of ATDS as set forth by Congress in 1991

remains.  *See* 47 U.S.C. § 227(a).[5]  Accordingly, we must begin anew to consider the definition of ATDS under the TCPA.

We "begin [our analysis] with the plain language of the statute."  *Guido v. Mount Lemmon Fire Dist.*, 859 F.3d 1168, 1170 n.1 (9th Cir. 2017) (alteration in original) (quoting *Negusie v. Holder*, 555 U.S. 511, 542 (2009)).  "If the 'statutory text is plain and unambiguous[,]' we 'must apply the statute according to its terms.'" *Id.* (alteration in original) (quoting *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009)).  If the language of a statute is ambiguous, "we may use canons of construction, legislative history, and the statute's overall purpose to illuminate Congress's intent." *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1133 (9th Cir. 2009) (quoting *Jonah R. v. Carmona*, 446 F.3d 1000, 1005 (9th Cir. 2006)).  "It is also 'a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quoting *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989)).  "In ascertaining the plain meaning of [a] statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole."  *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988); *see also United States v. Lewis*, 67 F.3d 225, 228–29 (9th Cir. 1995) ("Particular phrases must be construed in light

---

[5] Although the FCC had promulgated a regulation defining ATDS, the "regulation does little more than restate the terms of the statute itself," and "the existence of a parroting regulation does not change the fact that the question here is not the meaning of the regulation but the meaning of the statute." *Gonzales v. Oregon*, 546 U.S. 243, 257 (2006).

of the overall purpose and structure of the whole statutory scheme.").

As the D.C. Circuit noted, the definition of ATDS "naturally raises two questions: (i) when does a device have the 'capacity' to perform the two enumerated functions; and (ii) what precisely are those functions?" *ACA Int'l*, 885 F.3d at 695. We start by addressing the second question regarding functions. The TCPA defines ATDS as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). The question is whether, in order to be an ATDS, a device must dial numbers generated by a random or sequential number generator or if a device can be an ATDS if it merely dials numbers from a stored list. We must also determine to what extent the device must function without human intervention in order to qualify as an ATDS.

Marks and Crunch offer competing interpretations of the language of § 227(a)(1)(A), but both parties fail to make sense of the statutory language without reading additional words into the statute.

Marks points out that a number generator is not a storage device; a device could not use "a random or sequential number generator" to store telephone numbers. Therefore, Marks asserts, it does not make sense to read "store" in subdivision (A) as applying to "telephone numbers to be called, using a random or sequential number generator." 47 U.S.C. § 227(a)(1)(A). Instead, Marks contends that we should read the definition as providing that an ATDS is "equipment which has the capacity (A) to [i] store [telephone numbers to be called] or [ii] produce telephone numbers to be

called, using a random or sequential number generator; and (B) to dial such numbers."  In other words, a piece of equipment qualifies as an ATDS if it has the capacity to store telephone numbers and then dial them.

Crunch, in turn, argues that due to the placement of the comma in the statute, the phrase "using a random or sequential number generator" modifies both "store" and "produce."  Therefore, Crunch argues that the best reading of the statute defines an ATDS as "equipment which has the capacity (A) to store [telephone numbers produced using a random or sequential number generator]; or [to] produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."  As such, to qualify as an ATDS, according to Crunch, a device must store telephone numbers that have been produced using a random or sequential number generator.

After struggling with the statutory language ourselves, we conclude that it is not susceptible to a straightforward interpretation based on the plain language alone.  Rather, the statutory text is ambiguous on its face.[6]  The D.C. Circuit apparently agreed, stating that "[i]t might be permissible" for the FCC to adopt an interpretation that a device had to generate random or sequential numbers in order to be an ATDS, or that a device could be an ATDS if it was limited to dialing numbers from a stored list.  *ACA Int'l*, 885 F.3d at 702–03.   We therefore turn to other aids in statutory interpretation.

---

[6] Our statement in *Satterfield* that "the statutory text is clear and unambiguous" referred to only one aspect of the text: whether a device had the "*capacity* 'to store or produce telephone numbers . . . .'" 569 F.3d at 951 (emphasis in original).

C

Because the statutory language is ambiguous, we look at the context and the structure of the statutory scheme. The structure and context of the TCPA as originally enacted indicate that Congress intended to regulate devices that make automatic calls. Although Congress focused on regulating the use of equipment that dialed blocks of sequential or randomly generated numbers—a common technology at that time—language in the statute indicates that equipment that made automatic calls from lists of recipients was also covered by the TCPA.

This conclusion is supported by provisions in the TCPA allowing an ATDS to call selected numbers. For instance, the TCPA permitted use of autodialers for a call "made with the prior express consent of the called party." 47 U.S.C. § 227(b)(1)(A) (1991). To take advantage of this permitted use, an autodialer would have to dial from a list of phone numbers of persons who had consented to such calls, rather than merely dialing a block of random or sequential numbers.[7] Congress's 2015 amendment to the TCPA

---

[7] Other provisions in the statute prohibited calls to specified numbers. For instance, the statute authorized the FCC to establish and use a national database "to compile a list of telephone numbers of residential subscribers who object to receiving telephone solicitations" and who could not be called by telemarketers. *Id.* § 227(c)(3). It likewise prohibited calls to emergency telephone lines, *id.* § 227(b)(1)(A)(i), patient rooms in hospitals or other health care facilities, *id.* § 227(b)(1)(A)(ii), and paging services and cellular phones, *id.* § 227(b)(1)(A)(iii). In order to comply with such restrictions, an ATDS could either dial a list of permitted numbers (as allowed for autodialed calls made with the prior express consent of the called party) or block prohibited numbers when calling a sequence of random or sequential numbers. In either case, these provisions indicate Congress's understanding that an ATDS was not

provides additional information about Congress's views on the scope of the definition of ATDS. After the FCC issued its 2015 order, Congress added language to § 227(b)(1)(A)(iii), exempting the use of an ATDS to make calls "solely to collect a debt owed to or guaranteed by the United States." Bipartisan Budget Act of 2015, Pub. L. No. 114-74, § 301, 129 Stat. 584, 588 (codified at 47 U.S.C. § 227(b)(1)(A)(iii)). Like the exception allowing the use of an autodialer to make calls "with the prior express consent of the called party," this debt collection exception demonstrates that equipment that dials from a list of individuals who owe a debt to the United States is still an ATDS but is exempted from the TCPA's strictures. Moreover, in amending this section, Congress left the definition of ATDS untouched, even though the FCC's prior orders interpreted this definition to include devices that could dial numbers from a stored list. We "presume that when Congress amends a statute, it is knowledgeable about judicial decisions interpreting the prior legislation." *Porter v. Bd. of Trs. of Manhattan Beach Unified Sch. Dist.*, 307 F.3d 1064, 1072 (9th Cir. 2002). Because we infer that Congress was aware of the existing definition of ATDS, its decision not to amend the statutory definition of ATDS to overrule the FCC's interpretation suggests Congress gave the interpretation its tacit approval. *See Lorillard v. Pons*, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.").

Despite the ambiguity of the statutory definition of ATDS, reading the definition "in [its] context and with a view

limited to dialing wholly random or sequential blocks of numbers, but could be configured to dial a curated list.

to [its] place in the overall statutory scheme," *Brown & Williamson Tobacco Corp.*, 529 U.S. at 133, we conclude that the statutory definition of ATDS is not limited to devices with the capacity to call numbers produced by a "random or sequential number generator," but also includes devices with the capacity to dial stored numbers automatically. Accordingly, we read § 227(a)(1) to provide that the term automatic telephone dialing system means equipment which has the capacity—(1) to store numbers to be called or (2) to produce numbers to be called, using a random or sequential number generator—and to dial such numbers.[8]

We also reject Crunch's argument that a device cannot qualify as an ATDS unless it is fully automatic, meaning that it must operate without any human intervention whatsoever. By referring to the relevant device as an "*automatic* telephone *dialing* system," Congress made clear that it was targeting equipment that could engage in automatic *dialing*, rather than equipment that operated without any human oversight or

---

[8] Therefore, we decline to follow the Third Circuit's unreasoned assumption that a device must be able to generate random or sequential numbers in order to qualify as an ATDS. *Dominguez ex rel. Himself v. Yahoo, Inc.*, 894 F.3d 116, 120 (3d Cir. 2018) (stating, without explanation, that the plaintiff's claims against Yahoo failed because he "cannot point to any evidence that creates a genuine dispute of fact as to whether [Yahoo's device] had the present capacity to function as an autodialer by generating random or sequential telephone numbers and dialing those numbers"). In making this assumption, the Third Circuit failed to resolve the linguistic problem it identified in an unpublished opinion in the same case, where it acknowledged that "it is unclear how a number can be *stored* (as opposed to *produced*) using 'a random or sequential number generator.'" *Dominguez v. Yahoo, Inc.*, 629 F. App'x 369, 372 n.1 (3d Cir. 2015). Because the Third Circuit merely avoided the interpretive questions raised by the statutory definition of ATDS, its published opinion is unpersuasive.

control.  47 U.S.C. § 227(a)(1) (emphasis added); *see ACA Int'l*, 885 F.3d at 703 ("'[A]uto' in autodialer—or, equivalently, 'automatic' in 'automatic telephone dialing system,' 47 U.S.C. § 227(a)(1)—would seem to envision non-manual dialing of telephone numbers.").  Common sense indicates that human intervention of some sort is required before an autodialer can begin making calls, whether turning on the machine or initiating its functions.  Congress was clearly aware that, at the very least, a human has to flip the switch on an ATDS.  *See The Automated Telephone Consumer Protection Act of 1991, Hearing Before the Subcomm. on Commc'ns of the Comm. on Commerce, Sci., and Transp.*, 102nd Cong. 15 (1991) (statement of Robert Bulmash, President, Private Citizen, Inc.) (describing a pitch for autodialers in a telemarketing magazine as stating: "You come home from work[, and] turn on the machine, just like turning on a radio.").  Crunch does not dispute that the Textmunication system dials numbers automatically, and therefore it has the automatic dialing function necessary to qualify as an ATDS, even though humans, rather than machines, are needed to add phone numbers to the Textmunication platform.

D

Because we read § 227(a)(1) to provide that the term "automatic telephone dialing system" means equipment which has the capacity—(1) to store numbers to be called or (2) to produce numbers to be called, using a random or sequential number generator—and to dial such numbers automatically (even if the system must be turned on or triggered by a person), we conclude there is a genuine issue of material fact as to whether the Textmunication system is an ATDS.  The evidence in the record shows that the

Textmunication system stores numbers and dials them automatically to send text messages to a stored list of phone numbers as part of scheduled campaigns. This is sufficient to survive summary judgment.[9]  Because the district court did not have the benefit of *ACA International* or our construction of the definition of ATDS, we vacate the district court's ruling and remand it for further proceedings.[10]  Each party shall bear its own costs on appeal.

### VACATED AND REMANDED.

---

[9] Because we vacate the district court's decision on this ground, we decline the reach the question whether the device needs to have the current capacity to perform the required functions or just the potential capacity to do so. *Cf. Meyer v. Portfolio Recovery Assocs. LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012); *Satterfield*, 569 F.3d at 951.

[10] We also vacate the district court's dismissal of Crunch's motion to exclude Hansen's declaration as moot.  The district court based its ruling on its conclusion that there was no dispute of material fact as to whether the Textmunication system was an ATDS, and Hansen's declaration could not help create one.  To the extent Hansen's declaration addresses whether the Textmunication system calls automatically from a stored list, it is relevant to the question whether the system qualifies as an ATDS.

We **DENY** Marks's motion for judicial notice of two newspaper articles.  We "may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Because Marks has not pointed to any judicially noticeable facts in these articles, we decline to take judicial notice.